**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

FILED by RAL D.C.

MAR 0 7 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* STEPHEN M.BEAUJON,<br><br>Plaintiff and Relator,<br><br>v.<br><br>PLAZA HEALTH NETWORK *aka*<br>HEBREW HOMES HEALTH<br>NETWORK, INC.; HEBREW HOMES<br>MANAGEMENT SERVICES, INC.; ARCH<br>PLAZA, INC.; ARCH PLAZA<br>PROPERTIES, INC.;, AVENTURA PLAZA,<br>INC.; HEBREW HOME SINAI, INC.;<br>HEBREW HOMESOF MIAMI BEACH,<br>INC; HEBREW HOME OF NORTH DADE,<br>INC.; HEBREW HOME OF SOUTH<br>BEACH,INC.; JACKSON PLAZA, INC.;<br>PONCE PLAZA, INC.; PONCE PLAZA<br>PROPERTIES, INC.; SOUTH BEACH<br>NURSING AND REHABILITATION<br>CENTER, INC.; SOUTH BEACH PLAZA,<br>INC.; and WILLIAM ZUBKOFF, Ph.D.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

**12-20951**

Judge:

**FILED *IN CAMERA* AND CIV-MORENO
UNDER SEALPURSUANT TO
31 U.S.C. § 3730(b)(2)**

**DO NOT SERVE**

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## I.    INTRODUCTION

1.    Qui Tam Relator Stephen M. Beaujon brings this action on behalf of the

United States of America and himself to recover damages and penalties under the

False Claims Act, 31 U.S.C. § 3729 *et seq.,* against Defendants Plaza Health Network,

also known as Hebrew Homes Heath Network, Inc. ("Plaza" or "Hebrew Homes");

intimately-related corporate entities which operate and own defendant Plaza's group of

Miami nursing homes; and William Zubkoff, who is the architect and a principal

beneficiary of the fraudulent schemes alleged herein.  Defendants have submitted or caused the submission of false claims for payment to Medicare and Medicaid, and perhaps other federally-funded government healthcare programs, for patient care at its skilled nursing facilities ("SNFs" or "facilities") for patients admitted as a result of illegal financial relationships between Defendants and their referral sources, and have also submitted false claims in connection with therapy services.

2.     This complaint details conduct by the defendants and their facilities to offer and pay remuneration to physicians to induce the referrals of patients receiving services paid by Medicare, Medicaid, and other federally-funded health care programs, resulting in the submission of false claims for payment to the United States and the State of Florida.  Defendants billed the Medicare program nearly $130,000,000 (one hundred thirty million dollars) during the four years from January 1, 2008 through December 31, 2011.

3.     Relator alleges two basic schemes which led to false claims.  The first involves abusive "Medical Director" relationships with physicians to whom defendants pay substantial remuneration with a purpose of obtaining the physicians' patient referrals.  These fees do not constitute fair market value compensation for services provided by the physicians, but relate instead to the value defendants anticipate will result from the referrals.  Defendants also used other means of providing illegal compensation to physicians as *quid pro quo* for referrals.  Up to 70% of admissions to defendants' facilities have resulted from referrals by paid medical directors.

4.     By offering and paying remuneration to physicians in exchange for their patient referrals, defendants have violated, and continue to violate, the Stark laws and

- 2 -

the Anti-Kickback statute, and conditions of payment which attach to federal healthcare programs.

5.      The second scheme pursuant to which defendants submit false claims to the United States involves the provision of therapy services.  Defendants dramatically and systematically inflate their claims and receipts for reimbursement under Medicare and other federally-funded healthcare programs by billing for the provision of medically unnecessary services; by billing for the provision of unskilled services; by billing when no service has been performed; and by billing for individual therapy when group or concurrent therapy was performed.  Defendants also routinely create false records to support their false claims.

6.      In addition to dramatically increasing defendants' revenues derived from the United States, an important purpose of these schemes to submit false claims to the United States was to facilitate the application for and receipt by defendants of proceeds from federally-guaranteed loans predicated on real estate valuations which were dramatically inflated by the revenues illegally derived from these schemes.

## II.    JURISDICTION AND VENUE

7.      This action arises under the United States Civil False Claims Act, 31 U.S.C. § 3729 *et seq*.

8.      This Court has jurisdiction of the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and has personal jurisdiction over the defendants, because they do business in this District.

9.      Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. §3732(a) because defendants operate and transact business within this District.

10.     The facts and circumstances alleged in this complaint have not been pub-licly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media.

11.     Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act and other laws at issue herein.

12.     Prior to filing this action, Relator voluntarily disclosed to the United States the information on which his allegations are based.  Additionally, should there have been a public disclosure of any aspect of these allegations prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

III.    **PARTIES**

13.     The real party in interest to the claims set forth herein is the United States of America.

14.     Relator Stephen M. Beaujon, C.P.A., M.B.A., is a Florida resident.  He was hired by defendant Plaza Health Network in September of 2002 as Chief Financial Officer for the Plaza system, which includes all of the institutional defendants.

15.     Defendant Plaza Health Network, also known as Hebrew Homes, is a Florida non-profit corporation headquartered in Miami, Florida. Its network includes seven rehabilitation and skilled nursing facilities in Miami-Dade County.  (An eighth facility was closed in or about 2008 and is being renovated for a future re-opening.)

16.     Defendant William Zubkoff, Ph.D. is President of Hebrew Homes and is a citizen of Florida.  He is sued not in his representative capacity, but individually, based

- 4 -

on his direction of, participation in, and profit from the schemes to submit and cause submission of false claims alleged by Mr. Beaujon. Plaza's website asserts that defendant Zubkoff joined Hebrew Homes "in the early 1990s, bringing added expertise in real estate and health care administration to the team." In fact, defendant Zubkoff was previously the CEO of South Shore Hospital in Miami, which was disqualified by the United States Department of Health and Human Services from participation in the Medicare and Medicaid programs after being charged with overbilling Medicare in 2002; defaulting on bonds in 2003; violating insurance requirements in 2003; losing its accreditation from the Joint Commission on Accreditation of Healthcare Organizations in 2004; repeatedly violating a Corporate Integrity Agreement, which is a contract between the hospital and the United States; and engaging in, according to the Department of Health and Human Services, a "long history of noncompliance" culminating in "repeated and egregious failure" to honor commitments made to the United States."

17.    All other defendants are Florida non-profit corporations founded by Hebrew Homes The officers of all defendants include defendant Zubkoff and brothers Russell and Abraham Galbut. The corporations which operate the seven Plaza facilities are sued because they submitted or caused the submission of false claims, conspired with Hebrew Homes to do so, and received the proceeds from such claims. The remaining corporate defendants procured federal loan guarantees at values they knew to be fraudulently inflated by the false claims schemes at issue in this complaint. And all corporate defendants are sued as *alter egos* of defendant Zubkoff, directly used by him and others to facilitate the frauds detailed herein.

18.     Defendant Hebrew Management is a Florida non-profit corporation headquartered in Miami, Florida.  It provides management services for all defendants.

19.     Defendant Arch Plaza operates a 98-bed facility known as Arch Plaza Rehabilitation and Nursing Center, which is owned by defendant Arch Plaza Properties, Inc. Arch Plaza is located at 12505 NE 16th Avenue, North Miami.

20.     Defendant Aventura Plaza, sometimes called "Hebrew Home of North Dade," operates the 86-bed Aventura Plaza Rehabilitation and Nursing Center which is owned by defendant Aventura Plaza, Inc.  It is located at 1800 NE 168th Street, North Miami Beach.

21.     Defendant Hebrew South operates a 102-bed facility known as Hebrew Home of South Beach, which is owned by defendant South Beach Plaza, Inc.  The home is located at 320 Collins Avenue in Miami Beach.

22.     Defendant Jackson operates a 120-bed facility known as "Jackson Plaza." It is owned by defendant Hebrew Homes of Miami Beach, Inc.  Jackson Plaza is located at 1861 NW 8th Avenue, Miami.

23.     Defendant Ponce operates a 147-bed facility known as Ponce Plaza, which is owned by defendant Ponce Plaza Properties, Inc.  Ponce Plaza is located at 335 S.W. 12th Avenue, Miami.

24.     Defendant Sinai operates a 150-bed facility known as Sinai Plaza Rehabilitation and Nursing Center.  Sinai Plaza is located at 201 NE 112th Street in Miami.

25.     Defendant South Pointe operates a 230-bed facility known as South Pointe Plaza Rehabilitation & Nursing Center.  South Pointe Plaza is located at

- 6 -

IV.    **Rule 9(b), Fed. R. Civ. P. Allegations**

26.    Some of the factual information necessary to prove the allegations set out in this Complaint is exclusively in the possession of the defendants or the United States.

27.    Relator does not have routine access to information regarding specific claims for payment made by defendants to the United States or the State of Florida, and such information is exclusively in the control of defendants and/or the United States and the State of Florida.  However, as CFO, Relator has reviewed monthly billing summaries and other financial information and assisted in preparing Cost Reports, and is personally aware that claims are in fact submitted to the United States and the State of Florida.

28.    Each assertion herein that an allegation is made upon information and belief identifies a situation in which Mr. Beaujon has, based on his knowledge, a reasoned factual basis to believe the allegation, but may lack complete factual knowledge of it.

V.    **THE STATUTORY AND REGULATORY ENVIRONMENT**

29.    Defendants pay doctors illegal kickbacks to induce them to refer patients. As a result of defendants' illegal inducements, physicians refer Medicare and Medicaid patients to defendants' facilities.  By so doing, defendants submit false claims for payment and cause physicians to submit false claims for payment in violation of the Anti-Kickback and Stark laws.

30.    Defendants improperly inflate their reimbursement under Medicare and other federally-funded healthcare programs by billing for the provision of medically unnecessary services; by billing for the provision of unskilled services; by billing when no service has been performed; by billing for individual therapy when group or

- 7 -

concurrent therapy was performed, and by and falsifying records to support bogus claims.

31.     Defendants use the above schemes as a mechanism to artificially inflate their value to secure HUD-insured loans at more favorable rates than could be secured on the open market and to increase personal compensation and justify purchase of properties previously rented by facilities from related parties at inflated values using HUD as a method to lock-in these inflated values.

### A.     The Anti-Kickback Statute and the Stark Laws

32.     Under the Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product for which payment is sought from any federally-funded health care program, including Medicare, Medicaid, and TRICARE.  Violation of the statute can subject the perpetrator to criminal and civil penalties, as well as exclusion from participation in federally-funded healthcare programs.

33.     The AKS also provides that claims arising out of violations of its provisions are false claims. A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act.  42 U.S.C § 1320a-7b(g).

34.     The AKS is designed to, *inter alia*, ensure that patient care will not be improperly influenced and corrupted by compensation arrangements which are not directly related to the care of patients or which influence patient care decisions.  .

- 8 -

35.     Payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals, and remuneration offered or paid in return for the promise to send patients to a particular provider or facility qualifies as a kickback. Giving a person the opportunity to earn money for referring patients may also constitute an inducement under the AKS.

36.     The Stark Law, 42 U.S.C. §1395nn, is also known as the Physician Self-Referral Law.  Implementing regulations are at 42 C.F.R. § 411.350 *et. seq.*  The Stark Law prohibits submission by an entity providing healthcare items or services of claims for payment to Medicare or Medicaid based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the referring entity.

37.     The regulations implementing Stark, 42 U.S.C. § 1395nn, expressly make it illegal for anyone to receive federal payment for a healthcare service that was performed "pursuant to a prohibited referral" and requires such person to "refund all collected amounts on a timely basis."  42 C.F.R. § 411.353.

38.     Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider.  Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

39.     In 1993, Congress extended the Stark Law (Stark II) to referrals for ten additional designated health services (DHS) effective January 1, 1995, including (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical

- 9 -

equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services.  42 U.S.C. § 1395nn(h)(6).

40.     The Stark Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of the designated health service." 42 U.S.C. § 1395nn(h)(5)(B). Federal regulations implementing the statute also define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare...." 42 C.F.R § 411.351. A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." Id.

41.     Stark expressly prohibits any entity from presenting or causing the presenting of any claim resulting from a referral from a physician who has a financial relationship with the entity, unless that relationship fits into one of the specific exceptions in the statute.  For example, certain ownership interests in publicly-traded securities and in hospital entities are excepted.  See 42 U.S.C. § 1395nn(d).  Such exceptions are not applicable here.

42.     The Stark law was intended to prevent physicians from profiting (actually or potentially) from their own referrals. The Stark statute prospectively prohibits relationships that have been demonstrated to encourage over-utilization. It is a strict-liability statute.

43.     Any remuneration flowing between entities and physicians mustbe at fair market value for actual and necessary items furnished or services rendered based on

an arms-length transaction and should not take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties.

44.    Whenever a physician receives compensation for services furnished to an entity pursuant to a bona fide employment arrangement with the entity, the physician is deemed to have a "financial relationship" with the entity under the Stark law in the form of a "compensation arrangement." An entity-employed medical director would maintain such a financial relationship regardless of the amount of compensation received or the manner in which it was calculated. 42 U.S.C.§ 1395nn(h)(1); §§ 411.354(a), 411.354(c).

45.    Stark includes an exception protecting compensation to be paid pursuant to such employment arrangements 42 U.S.C. § 1395nn(e)(2); § 411.357(c). In order to qualify for protection under this exception, the arrangement must satisfy the following requirements:

   a.    The employment must be for identifiable services but does not have to be memorialized.

   b.    The amount of compensation paid to the physician must be consistent with fair market value of the services furnished and must not be determined in a manner that takes into account the volume or value of Medicare referrals generated by the physician for the entity(excluding referrals for professional services personally performed by the referring physician).

   c.    The remuneration paid to the physician must be reasonable even if no Medicare referrals were made to the entity.

46.    Compliance with the AKS and the Stark Law are conditions of payment of all claims submitted for reimbursement by Medicare, Medicaid, and other federally-funded programs.

47.     Claims submitted or caused to be submitted in violation of the AKS or the Stark law are false claims.

48.     Each of the federally-funded health care programs requires every provider who seeks payment from the program to sign Provider Agreements in order to establish their eligibility to seek reimbursement from the Medicare and Medicaid Programs.  As part of these agreements, without which the providers may not seek reimbursement from federal health care programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-855I.

49.     When a provider submits a claim for payment, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-kickback Statute and the Stark law.

50.     Every Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator.

51.     The CMS Form 2540-96 SNF Cost Report certification page includes the following statement:

> Misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or

- 12 -

indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

52.    The cost report certifier is also required to certify that:

[T]o the best of my knowledge and belief, it [the SNF Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

53.    As a result of their scheme to utilize improper financial relationships to obtain referrals from physicians, defendants submitted and caused the submission of false claims to the United States in violation of Stark and Anti-Kickback Laws.

**B.    Reimbursement by federally-funded health care programs**

54.    The Health Insurance for the Aged and Disabled Program, popularly known as Medicare, was created in 1965 as part of the Social Security Act ("SSA"). The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

55.    The Medicare program consists of two parts.  Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care.  42 U.S.C.§ 1395c-1395i-2(1992).  Medicare Part B authorizes the payment of federal funds for medical and other health services, including without limitation physician services, supplies and services incident to physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services.  42 U.S.C. § 1395(k),(i), (s).

56.    For enrollees of Medicare and other federal insurance programs, Part A of the program provides coverage for up to 100 days for skilled therapy services provided

- 13 -

to a beneficiary while inpatient in a SNF.  Part B of the program provides coverage for skilled therapy to beneficiaries who have either exhausted their Part A benefit or are not otherwise entitled to Part A coverage.

57.     The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments.  CMS administers Medicaid on the federal level.  Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury.  42 C.F.R. §§ 430.0-430.30 (1994). The federal share of each state's Medicaid expenditures varies by state.

58.     Various other federally-funded medical coverage programs exist to help discrete populations of enrollees obtain medical care, including the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Veterans Administration, among others.

59.     Reimbursement practices under all federally-funded healthcare programs closely align with the rules and regulations governing Medicare reimbursement.

60.     Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the carriers act on behalf of CMS.  42 C.F.R. § 421.5(b) (1994).

- 14 -

61.     Faced with escalating costs and concerned about inefficiency, Congress fundamentally overhauled the Medicare reimbursement methodology in 1983, establishing the Prospective Payment System ("PPS") to reimburse hospitals for the operating costs of inpatient healthcare services rendered to Medicare beneficiaries. Pub. L. No. 98-21, 97 Stat. 65 (1983) (codified as amended at 42 U.S.C. § 1395ww(d)); 42 C.F.R. Pt. 412 (2001).  With certain exceptions, PPS reimburses for inpatient Medicare services according to a per-patient standardized rate, called the Diagnostic Related Group ("DRG") rate.  42 U.S.C. § 1395ww(d)(3)(A), (D).

62.     Congress expanded the PPS to SNFs for cost reporting periods beginning on or after July 1, 1998.42 C.F.R. §§ 413.330.  Medicare's PPS reimburses facilities for the operating costs of inpatient healthcare services rendered to Medicare beneficiaries according to a per-patient standardized rate, called a *per diem*.

63.     The *per diem* is designed to account for the costs of each enrollee's stay in a SNF, including the cost of skilled therapy services.

64.     The *per diem* for each beneficiary depends on the severity of the beneficiary's condition, classified according to a Resource Utilization Group, or "RUG." Each RUG category groups beneficiaries who have similar conditions and/or limitations, and who will therefore require similar care, and are therefore reimbursed on a similar rate.  The current version of RUG classifications is RUG IV.RUG III was applicable from July 1, 1998 to September 30, 2010.

65.     For each beneficiary who receives therapy, the RUG assigned to each beneficiary for the entire treatment period is based on the amount of therapy assigned during an assessment period.  SNFs must assess the clinical condition of beneficiaries

- 15 -

by completing the Minimum Data Set ("MDS") assessment for each Medicare resident receiving Part A SNF-level care for reimbursement under the SNF PPS.  The MDS assessments are also part of required Resident Assessment Instruments ("RAI").  The MDS assessments are primarily due on the 5th, 14th, 30th, 60th and 90th days of treatment, upon admission into the SNF.  42 C.F.R. 413.343.During each assessment period, the skilled therapy needs of the beneficiary are evaluated, and the total time in minutes of all therapy provided is documented by the Therapy Department to the MDS coordinator.

66.     The Medicare-required PPS assessments are coded on the MDS 3.0, effective October 1, 2010.  Prior to October 1, 2010, the assessments were coded on the MDS 2.0.  On the basis of these assessments, a beneficiary is assigned to a RUG category.

67.     The SNF receives a higher *per diem* for a beneficiary requiring more intensive care (and thus falling into a higher RUG category) than a beneficiary requiring less intensive care.  Because the skilled therapy minutes documented during the assessments are captured by the beneficiary's RUG category, the SNF will be reimbursed for that level of skilled therapy (in minutes) for the duration of the treatment period covered by that assessment.

68.     The data used to assign a beneficiary into a particular RUG category are gathered during the assessment.  Because higher RUG categories result in higher *per diem* reimbursements during the entire treatment period covered by the assessment irrespective of the level of care actually provided, false manipulation of the assessment (for example, by including medically-unnecessary levels of skilled therapy and artificially

- 16 -

increasing treatment times) results in improperly inflated reimbursement for the remainder of the treatment period.  Generally, the higher the number of therapy minutes reported in an assessment period, the greater the level of reimbursement to the SNF, with the highest level of therapy reimbursement to the facility occurring for those in the RU (ultra high) category.

69.     For Part A beneficiaries, the SNF submits claims for therapy services as part of the Part A claims for the *per diem* assigned to that resident.  The Resource Utilization Group ("RUG") category for each Part A patient should reflect the facility's costs for services performed for Part A beneficiaries.

70.     Claims for reimbursement for skilled therapy services provided by SNFs are submitted to Medicare on Claim Form 1450 (also called a UB-04).  CMS makes payments on the claims for reimbursement retrospectively (after the services are rendered).

71.     At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its facility and Medicare patient days by RUG category. The SNF is required to accurately report its actual payments to suppliers, including the skilled therapy providers.

72.     The annual cost report is the final claim and is submitted on CMS Form 2540-96.  Annual cost reports constitute the final accounting of the facility's federal program reimbursement.

73.     As a condition of payment, the SNF must certify in its annual cost report that all data is accurately and truthfully reported and that it has complied with all applicable laws and regulations.

- 17 -

74.     For Part B beneficiaries who are not eligible under Part A or who have exhausted Part A benefits, the SNF submits claims for payment for the therapy services under the Medicare Fee Schedule ("MFS").  The MFS establishes a per-service payment for individual therapy services based on time-based codes appropriate to the service provided.

75.     Reimbursement under the MFS is determined according to a standardized coding system assigned to procedures set forth in the Health Care Financing Administration's Common Procedure Coding System ("HCPCS").  Under the HCPCS, standardized codes, called Current Procedural Terminology ("CPT") codes, are assigned to various procedures.  The CPT code assigned to a medical procedure determines the payment amount under Part B.

76.     To receive reimbursement under Part B for skilled therapy services, the SNF submits claims to government programs using CPT codes which correspond to the service rendered.

77.     Physicians submit claims for their professional services to Part B of the program on Form CMS-1500.

C.      **Reimbursement for skilled therapy services**

78.     Skilled therapy services are covered and reimbursed under government healthcare programs only if the services satisfy the following conditions of payment.

79.     First, the therapy services must be "skilled rehabilitation services," which are services provided pursuant to a physician's order which require the skill of a licensed physical therapist, occupational therapist, or speech pathologist.  CMS, Skilled Nursing Facility Manual ("SNF Manual") at § 214.1; Medicaid Benefits Policy Manual

- 18 -

("MBPM") Chapter 8, 30.2.1; 42 C.F.R. §§ 409.17, 409.32. To be considered "skilled," the service must be so inherently complex that it can only be performed safely and/or effectively by or under the general supervision of skilled personnel. *Id.*at 30.2.2.

80.     Second, therapy services must be medically necessary. SNF Manual § 60.4; *accord* 42 C.F.R. § 410.12; 42 C.F.R. § 424.24. A regimen of skilled therapy is medically necessary—that is, necessary and reasonable—when it is: (1) a specific and effective treatment for the beneficiary's condition under accepted standards of medical practice; (2) a treatment that constitutes physical therapy, meaning that the treatment must be of such a level of complexity and sophistication or the condition of the beneficiary must be such that the services can only be safely and effectively performed by a qualified physical therapist or performed by one under the supervision of such a therapist; (3) predicated upon the expectation that the beneficiary's condition will improve significantly in a reasonable period of time; and (4) of an amount, frequency, and duration that is reasonable. SNF Manual § 230.3; MBPM 30.4. Therapy that is not medically necessary is not reimbursable.

81.     Third, therapy must be provided pursuant to a written "plan of treatment" created either by the beneficiary's physician, licensed therapist or other individual authorized by Medicare regulations. 42 C.F.R. § 409.17.
The plan must be established before treatment begins by one of the following:

    (1)     A physician;

    (2)     A nurse practitioner, a clinical nurse specialist or a physician assistant;

    (3)     The physical therapist furnishing the physical therapy services;

- 19 -

(4)    A speech-language pathologist furnishing the speech-language pathology services; or

(5)    An occupational therapist furnishing the occupational therapy services.  42 C.F.R. § 409.17(b).

82.    The plan must:

(1)    Prescribe[ ] the type, amount, frequency, and duration of the physical therapy, occupational therapy, or speech-language pathology services to be furnished to the individual; and

(2)    Indicate[ ] the diagnosis and anticipated goals.

42 C.F.R. § 409.17(c).

83.    Medicare regulations specify that therapy must be delivered in accordance with a plan of treatment established by the beneficiary's physician or qualified, licensed therapist after an assessment of the beneficiary.  42 C.F.R. § 409.17.  Therapy delivered at the direction of someone other than the beneficiary's physician or licensed therapist and not in accordance with the established plan of treatment is in violation of these conditions of payment and are not reimbursable by Medicare, Medicaid or other government payers.

84.    As discussed in paragraph 71, a beneficiary whose skilled therapy treatment is covered under Part A must undergo assessments to determine the beneficiary's RUG category or *per diem* level, and in turn, the facility's reimbursement amount.

85.    On August 11, 2009, CMS announced a new rule affecting how SNFs can bill for "concurrent therapy."  74 FR 40288.

86.    Prior to October 1, 2010, concurrent therapy was the practice of one professional therapist treating multiple patients at the same time while the patients are

- 20 -

performing different activities. In the SNF Part A setting, concurrent therapy was distinct from group therapy, where one therapist provides the same services to everyone in the group. In a concurrent model, the therapist worked with multiple patients at the same time, each of whom can be receiving different therapy treatments.

87.     CMS issued a Final Rule in 2006 discussing prevention of inappropriate use of concurrent therapy in skilled nursing facilities. 70 Fed. Reg. 45026 (Aug. 4, 2005).  Medicare explained that because "the therapist's professional judgment was being overridden by pressures to be more productive by treating multiple beneficiaries concurrently," it was necessary to emphasize that the decision to provide concurrent therapy must be based on "valid clinical considerations." CMS reiterated that "the therapist's professional judgment should not be compromised and concurrent therapy should be performed only when it is clinically appropriate to render care to more than one individual (other than group therapy) at the same time."  70 Fed. Reg at 45036-37.

88.     In the Final Rule issued in 2009, CMS again reiterated its position regarding the necessity of the independent judgment of the therapist to determine clinically necessary services: "There are potentially instances when treatment decisions are influenced by facility or provider productivity requirements. We agree that the delivery of therapy services should be based on the therapist's professional and clinical judgment solely according to the individual needs of each patient."  Id. at 40316. In explaining the reasons behind the new rule issued in 2009, CMS explained:

> [W]e noted a significant shift in the provision of therapy from individual
> one-on-one treatment to a concurrent basis. We stated that given that
> Medicare and Medicaid patients are among the frailest and most
> vulnerable populations in nursing homes, we believed that the most
> appropriate mode of providing therapy would usually be individual, and not
> concurrent therapy. We indicated that concurrent therapy should never be

the sole mode of delivering therapy to a SNF patient; rather, it should be used as an adjunct to individual therapy when clinically appropriate. Further, we expressed concern that the current method for reporting concurrent therapy on the MDS creates an inappropriate payment incentive to perform concurrent therapy in place of individual therapy, because the current method permits concurrent therapy time provided to a patient to be counted in the same manner as individual therapy time.

Id. at 40314.

89.     Effective October 1, 2010, CMS provided that concurrent therapy may only be provided to no more than two patients at a time and could no longer be counted as individual therapy time for each of the patients involved, but rather, would require allocating the minutes among the patients.  *Id.* at 40316-17.

90.     On August 8, 2011, CMS announced a new rule affecting how SNFs can bill for group therapy.  76 FR 48486.  Prior to October 1, 2011, group therapy was the practice of one professional therapist treating multiple patients at the same time while the patients were performing either the same or similar activities.

91.     In explaining the reasons behind the new rule, CMS explained:

We noted that, using our STRIVE data as a baseline, we identified two significant changes in provider behavior related to the provision of therapy services to Medicare beneficiaries in SNFs under RUG-IV. First, we saw a major decrease in the amount of concurrent therapy performed in SNFs, the minutes for which are divided between the two concurrent therapy participants when determining the patient's appropriate RUG classification. At the same time, we found a significant increase in the amount of group therapy services, which are currently not subject to the allocation requirement. Given this increase in group therapy services, we expressed concern that the current method for reporting group therapy on the MDS creates an inappropriate payment incentive to perform the group therapy in place of individual therapy, because the current method of reporting group therapy time does not require allocation among patients, as noted by several commenters.

Id. at 48510-11.

92.     Effective October 1, 2011, group therapy is restricted to an exact number of four patients and the minutes must be allocated among the patients (i.e. divided by four) and can no longer be billed as individual therapy time for each of the patients involved.  *Id.* at 48514 and 17.

## VI.   FACTS

### A. Overview

93.      Defendants offer and pay illegal incentives to physicians to induce them to refer patients to their facilities, rewarding these physicians for referring these patients and disguising the payments as sham medical directorships.

94.     For example, doctors who received "medical director" payments from defendants in 2007, generated about 53% of patient admissions at its facilities that year. Doctors who received payments from defendants in 2008 generated approximately 71% of patient admissions at its facilities in 2008.  Doctors who received payments from defendants in 2009 generated approximately 64% of patient admissions at its facilities through the first ten months of 2009.

95.     Defendants' senior management and owners know that Medicare, Medicaid and other federal program beneficiaries represent a significant percentage of referred patients.

96.     As explained in detail below, defendants offer and pay remuneration in excess of fair market value.  While defendants provide gifts and entertainment to physicians, the vast majority of the kickbacks at issue take the form of monthly payments under sham medical-director agreements.

- 23 -

97.     Defendants' business model depends on offering and paying illegal incentives to increase the census numbers at its facilities.

98.     The individual defendants and other members of management openly discuss the conviction that medical director arrangements are a guarantee of increased referrals.

99.     In recent years, defendants have paid at least $3.8 million to physicians who entered into arrangements to serve as "medical directors" at their facilities.

100.    These payments routinely are made based on form invoices without any reference to time spent or activities performed.  Indeed, Relator is not aware of any time sheets or similar support ever being submitted.

101.    Indeed, many "invoices" are actually filled out by defendants' personnel, and then "submitted" to defendant for payment, without any involvement by the physician.

102.    These payments are not based on legitimate medical director services.

103.    Some of the physicians have signed Medical Director Agreements.  While these agreements varied over time, with the exception of one doctor, no amount of hours or hourly rate was contracted-for by defendants, and there was never any requirement for the directors to submit time records for defendants' review.  Relator is only aware of one Medical Director, Dr. Cardenas from the University of Miami, who reported and was paid based on an hourly rate.

104.    Relator is not aware of any meaningful evaluation of the doctors conducted by defendants, nor of any effort by defendants to reasonably assure that the work identified in the contract is actually performed.

105.   Even had the physicians performed the work identified in their contracts, the fees paid by defendants are not commercially reasonable.  It would not be commercially reasonable to pay monthly stipends ranging from $1,000 to  $7,500 for the limited duties spelled out in the Medical Director Agreements.  Nor is it commercially reasonable that facilities would be in need of up to eight medical directors to perform such duties.  Facilities of this size and duties of this nature reasonably require no more than one or two.

106.   Defendants improperly inflate their reimbursement under Medicare and other federally-funded healthcare programs by falsifying therapy logs which results in inaccurate MDS forms and results in billing for the provision of medically unnecessary services; billing for the provision of unskilled services; billing when no service has been performed; billing for individual therapy when group or concurrent was performed, and falsifying records to support bogus claims.

107.   Defendants use the above schemes as a mechanism to artificially inflate its value to secure HUD-insured loans at more favorable rates than could be secured on the open market and to cause facilities to be sold by related parties to not-for-profit nursing homes in a commercially unreasonable manner not in accordance with fair market value rules as are commonly understood and as defined under tax regulations.

## B. Medical Director Agreements

108.   Defendants engaged an unreasonable number of physicians through paid medical directorships.  There have been at least 55 doctors or physiatrists who have had medical director arrangements with defendants at some time between 2004 and the present.  A sample of physicians who were paid remuneration by defendants pursuant

- 25 -

to paid arrangements include, without limitation, those identified in the following table. The time frame is based on information currently known to Relator:

| Name | Facilities | Time Period | Payments to EOY 2011 |
|---|---|---|---|
| Anthony Abbassi | Ponce; Jackson | 2008 through 2011 | $357,000 |
| Michael Bahrami | Sinai | 2008 through 2011 | $159,500 |
| Manuel Dominguez | Jackson | 2005 through 2011 | $175,000 |
| Ivan Jonas | Sinai, one month Arch | 2007 through 2011 | $271,500 |
| Rafael Palmerola | Ponce; South Pointe | 2007 through 2011 | $227,000 |
| Terrence Peppard | Ponce; South Pointe; Jackson | 2006 to 2009 | $210,000 |
| Jason Radick | Sinai | 2007 through 2011 | $210,000 |
| Howard Reinfeld | Sinai, Arch | 2007 through 2011 | $246,000 |
| Ivan Rodriguez | Arch | 2008 through 2011 | $125,000 |
| Carlos Vaca | Ponce; Jackson | 2005 through 2011 | $197,000 |
| Luis Veras | Ponce; South Pointe | 2008 through 2011 | $200,000 |

Because defendants paid these doctors with the purpose of inducing referrals of patients whose cost of care was then submitted to Medicare Part A, Medicare Part B, or other federal payers, the claims submitted under these provider names and numbers, as well as the facilities' claims, are false claims.

109.   Relator encouraged defendants to enter into legitimate contracts with its medical directors.  However, when defendants did memorialize the arrangements, the contracts support the allegation that defendants do not hire the Medical Directors to conduct work the fair market value of which comports with the promised remuneration

110.   For instance, on July 1, 2001, Dr. Manuel Dominguez entered into a Hebrew Homes Medical Director Agreement with Jackson Plaza pursuant to which

- 26 -

Jackson Plaza agreed to and did pay $1,500 per month for services.  The contract required that both parties "shall maintain complete records of all services rendered." Relator is aware of no records indicating that defendants enforced this provision, or themselves maintained records of any services provided.  While the agreement stated it was effective as of 2001, the signature date was March 18, 2004.  An additional term was added on December 28, 2005.

111.   On January 27, 2003, Dr. Leilany Irizarry entered into a Medical Director Agreement with Arch.  Arch agreed to and did pay a monthly fee of $1,000 for Dr. Irizarry's services.  Arch did not require the physician to keep or submit time records. The agreement did not provide for an evaluation of the performance of the physician's duties.

112.   On April 1, 2004, Dr. Carlos Vaca entered into a Hebrew Homes Medical Committee Agreement with Jackson Plaza which provided for a monthly fee of $2,000. Jackson Plaza did not and does not require Dr. Vaca to keep or submit time records. The agreement does not provide for any evaluation of Dr. Vaca's performance.

113.   On August 1, 2005, Dr. Ivan Jonas entered into a Medical Director Agreement with Aventura.  Aventura agreed to pay a monthly fee of $1,000 for Dr. Jonas's services.  Aventura did not require the physician to keep or submit time records. The agreement did not provide for an evaluation of the performance of the physician's duties.

114.   On December 1, 2005, Dr. Manuel A. Ojeda entered into a Medical Committee Member Agreement with South Pointe.  South Pointe agreed to pay a monthly fee of $1,500 for Dr. Ojeda's services.  South Pointe did not require Dr. Ojeda

to keep or submit time records, and the contract does not provide for any evaluation of the doctor's performance.

115.    On December 1, 2005, Dr. Raphael Palmerola entered into a Medical Director Agreement with South Pointe.  South Pointe agreed to pay a monthly fee of $2,000 for Dr. Palmerola's services.  The monthly fee was raised to $4,000, effective May 1, 2008.   This agreement did not require the physician to keep or submit time records, nor provide for an evaluation of the performance of the physician's duties.

116.    On September 1, 2006, Dr. Onel Corrales contracted with Jackson Plaza to serve as Medical Director for a monthly fee of $2,000.  Jackson Plaza did not require Dr. Corrales to keep or submit time records.  The agreement did not provide for an evaluation of the performance of the physician's duties.

117.    On December 1, 2006, Dr. Terrence Peppard contracted with Jackson Plazato serve as Medical Director for a monthly fee of $2,000.  Although Dr. Peppard is a physiatrist, his purported duties and functions under the contract are identical to those of Drs. Vaca and Corrales.  Jackson Plaza did not require Dr. Peppard to keep or submit time records.  The agreement did not provide for an evaluation of the performance of the physician's duties.

118.    On December 1, 2006, Dr. Terrence Peppard also entered into a Medical Director Agreement for Physiatrist Services with South Pointe.   South Pointe agreed to pay $2,000 monthly for Dr. Peppard's services, and Peppard agreed to "record promptly and maintain all information pertaining to the allocation of physician compensation costs under the Medicare program that, in the judgment [] of the Company is necessary in order for the Company to have time records relating to Doctor's services hereunder in

compliance with the requirements of 42 C.F. R. Section 415.60, as amended.  The form of such time records shall be determined by the Company, and the Doctor shall consult with the Company from time to time regarding the form and content of such records." Relator has seen no indication that defendants ever enforced this provision, or that Peppard provided such information.

119.   On December 1, 2007, Dr. Ivan Rodriguez entered into a Medical Advisor Agreement with Arch.  Arch agreed to pay a monthly fee of $2,500 for Dr. Rodriguez's services.  The Doctor agreed to "record promptly and maintain all information pertaining to the allocation of physician compensation costs under the Medicare program that, in the judgment [] of the Company is necessary in order for the Company to have time records relating to Doctor's services hereunder in compliance with the requirements of 42 C.F. R. Section 415.60, as amended.  The form of such time records shall be determined by the Company, and the Doctor shall consult with the Company from time to time regarding the form and content of such records." Relator does not believe that defendants ever enforced this provision.

120.   On July 1, 2008, Dr. Rodriquez also entered into a Co-Medical Director Medical Committee Agreement with Aventura.  Aventura did not require Dr. Rodriquez to keep or submit time records.  The agreement did not provide for an evaluation of the performance of the physician's duties.

121.   On February 15, 2007, Dr. Richard Cuello-Fuentes entered into a Medical Advisor Agreement with South Pointe.  South Pointe agreed to pay a monthly fee of $4,000 for Dr. Cuello-Fuentes' services.  The Doctor agreed to "record promptly and maintain all information pertaining to the allocation of physician compensation costs

under the Medicare program that, in the judgment [] of the Company is necessary in order for the Company to have time records relating to Doctor's services hereunder in compliance with the requirements of 42 C.F. R. Section 415.60, as amended.  The form of such time records shall be determined by the Company, and the Doctor shall consult with the Company from time to time regarding the form and content of such records." Relator does not believe that defendants ever enforced this provision.

122.   On November 1, 2007, Dr. Carmel Barrau entered into a Medical Advisor Agreement with Arch.  Arch agreed to pay a monthly fee of $1,000 for Dr. Barrau's services.  The Doctor agreed to "record promptly and maintain all information pertaining to the allocation of physician compensation costs under the Medicare program that, in the judgment [] of the Company is necessary in order for the Company to have time records relating to Doctor's services hereunder in compliance with the requirements of 42 C.F. R. Section 415.60, as amended.  The form of such time records shall be determined by the Company, and the Doctor shall consult with the Company from time to time regarding the form and content of such records." Relator does not believe that defendants ever enforced this provision.

123.   On January 1, 2008, Dr. Tony Abbassi entered into a Medical Advisor Agreement with Jackson Plaza.  Jackson Plaza agreed to pay a monthly fee of $5,000 for Dr. Abbassi's services.  The Doctor agreed to "record promptly and maintain all information pertaining to the allocation of physician compensation costs under the Medicare program that, in the judgment [] of the Company is necessary in order for the Company to have time records relating to Doctor's services hereunder in compliance with the requirements of 42 C.F. R. Section 415.60, as amended.  The form of such

time records shall be determined by the Company, and the Doctor shall consult with the Company from time to time regarding the form and content of such records." Relator does not believe that defendants ever enforced this provision. This Agreement remained effective until July 1, 2009, when Dr. Abbassi entered into an identical agreement with Jackson Plaza at an increased monthly fee of $7,500.

124.    On March 1, 2008, Dr. Joan Lyn entered into a Medical Advisor Agreement with Arch. Arch agreed to pay a monthly fee of $1,000 for Dr. Lyn's services. The Doctor agreed to "record promptly and maintain all information pertaining to the allocation of physician compensation costs under the Medicare program that, in the judgment [] of the Company is necessary in order for the Company to have time records relating to Doctor's services hereunder in compliance with the requirements of 42 C.F. R. Section 415.60, as amended. The form of such time records shall be determined by the Company, and the Doctor shall consult with the Company from time to time regarding the form and content of such records." Relator does not believe that defendants ever enforced this provision.

125.    On March 4, 2008, Dr. Hamid Keshvari-Rasti entered into a Medical Committee Member Agreement with Hebrew South. Hebrew South agreed to "refer patients to the PHYSICIAN when services are necessary according to the Facility Health Care Policies." No monthly payment fee is listed. Hebrew South did not require Dr. Keshvari-Rasti to keep or submit time records. The agreement did not provide for an evaluation of the performance of the physician's duties.

126.    On October 1, 2008, Dr. Dagmar Lemus entered into a Medical Advisory Committee Agreement with Jackson Plaza. Jackson Plaza agreed to pay a monthly fee

of $2,000 for Dr. Lemus's services.  Jackson Plaza did not require the physician to keep or submit time records.  The agreement did not provide for an evaluation of the performance of the physician's duties.

127.   On April 28, 2008, Dr. Jose Avila signed a Co-Medical Director Medical Committee Agreement with Aventura, to begin May 1, 2008.  Aventura agreed to pay a monthly fee of $2,000 for Dr. Avila's services.  Aventura did not require the physician to keep or submit time records.  The agreement did not provide for an evaluation of the performance of the physician's duties.

128. Based on Relator's experience with their payment policies, Relator does not believe defendants ever conducted meaningful evaluations of the physicians' performances.  Moreover, defendants' overarching purpose in retaining Medical Directors was to obtain referrals.

C.   **Defendants' culture and policy is to pay physicians kickbacks on account of their capacity to refer patients**

129.   Plaza's corporate policy and basic business model is to illegally incentivize physicians through cash or in kind remuneration in order to secure business.

130.   Plaza's board of directors, senior management, facility administrators and consultants know that the corporate policy and practice of the defendants is to pay physicians to generate referrals.  It is common knowledge that defendants cannot reach the census figures expected by their senior management.

1. **Kickbacks used to increase census**

131.   Internal communications and reports reflect that defendants emphasize the need to influence doctors to increase census.

- 32 -

132.   By way of example, on April 5, 2006, there was a Management Committee meeting attended by several members of the board.  In discussing the census, the minutes reflect that "Medicare is at 19%; need to be at 25%; GOAL FOR NETWORK: TO HAVE 25% MEDICARE AT A MINIMUM AND 95% OCCUPANCY ON OPEN STEADY BEDS AND TO BE AT 95-100% CAPACITY."  The minutes also noted: "FOR CENSUS DEVELOPMENT, NEED TO WORK: DOCTORS, SOCIAL WORKERS AND FAMILIES; *need doctor loyalty*.  Each administrator should meet with their doctors regularly."  (Emphasis supplied.)

133.   On June 5, 2006, there was a Management Committee meeting attended by several members of the board.  The minutes reflect the census was down.  One "topic" was noted as "Defendant Zubkoff is meeting the Medical Director of Mercy and taking him to South Beach, South Pointe and Ponce.  We must recruit more Hispanic and Anglo doctors!  DOCTORS ARE KEY.  Joyce and Barbara Artlles are meeting with Kindred doctors and North Shore to market Arch."

134.   On July 12, 2006, then-Marketing Consultant (and now Rehabilitation Therapy Coordinator) Herman Epstein wrote to high-level employees and members of the board regarding "heavy hitters," by which he meant physicians with a capacity to refer a large number of patients.  Mr. Epstein described his attempts to woo Drs. Halphen and Valdivia back into the Plaza system.  He wrote that Dr. Valdivia is a "heavyweight," who he wanted to assure that he, the physician, "will not lose his patients any longer to other doctors. ... I offered him breakfast, lunch or dinner.  Need to work more on him."

- 33 -

135.    On August 8, 2006, there was a Management Committee meeting attended by several members of the board.  The minutes include the following entry:

> Herman when and visit Cedars Hospital, working on to set up lunch dates with administrator and case man[a]gers.
>
> Herman needs follow-up on a [consistent] basis with all his contacts.
> Cedars right now a weak sister to our Jackson Plaza facility.
> Terry needs to get to Cedars with her case managers and social workers.

136.    Defendant Zubkoff maintained a Physician's Referral Log, in which target physicians also were identified as "heavy hitters."  Of the nine doctor practices identified as targets, many were Medical Directors.  Defendant Zubkoff tracked the number of referrals each doctor made and whether fees were paid to that doctor.  Relator has seen the Log for January 2007, and believes that defendant Zubkoff regularly kept close track of the number of referrals made by the doctors to whom defendants paid kickbacks.

137.    On October 2, 2007, Board Chairman Russell Galbut approved the decision to terminate Betty Diaz's employment as Clinical Care Coordinator of South Pointe purportedly because of substandard care given to patients; however he emphasized in an email to Marvin Greenwald that the termination must be done "nicely" because he did not want to lose his referral base.

138.    On December 10, 2007, defendant Zubkoff informed Relator and other individuals of his plans to give Dr. Tony Abbassi a tour at Ponce, Jackson and Hebrew South, noting that "this is the #1 group from Cedar's and for Villa Maria."

139.    On January 12, 2008, defendant Zubkoff commented that "[c]oncerning occupancy – For 2007 overall occupancy was 3% above 2006 and Rehab/Medicare

occupancy was 10% above 2006.  Hospital and doctor relationships are critical to the
success of the Network."

140.    On February 13, 2008, Mr. Galbut again wrote to several individuals,
including board members and high level employees regarding the weekly census,
imploring "what is going on with our network? This is lowest count of clients we have
ever had! And this is the height of the season.  We were in the lowest quarter last ACHA
report! This time we will be off the charts as the worst occupancy of anyone.  Please
start working on occupancy! I just cannot understand what is going on? Advertise
change doctors do whatever you have to do! We will not survive long if we do not
change these dynamics!"

141.    On March 13, 2008, defendant Zubkoff described Jackson Plaza's 2008
projection as "[t]he new rehab emphasis with new doctors and hospital relationships
[which] should improve the year overall."

142.    On March 24, 2008, Mr. Galbut wrote members of the board, high-level
employees and administrators regarding the weekly census, exhorting them to "work
harder on census please!"  Defendant Zubkoff responded with a list of immediate
priorities.  Included in his list were to "[r]e-establish 'old-base' doctors" and to "[d]evelop
new doctors from University, Cedars, Mercy, and Jackson North."

143.    On August 1, 2008, defendant Zubkoff wrote an email to facility
administrators copying members of the board and high-level employees, including
Relator, regarding the census.  "Census remains challenging and disappointing. … So
…what do we do next? ***Demand loyalty and performance from our old doctors***

- 35 -

(don't accept excuses of "things are quiet" or tolerate their games with home health).
Continue to *recruit a couple of new doctors* for each facility."  (Emphasis supplied.)

144.   At a senior management meeting on December 21, 2011, upon learning that Arch was showing a $9,000 loss for November, 2011, defendant Zubkoff's solution was to add new doctors.  He advised Relator that Plaza would add new medical directors to the Arch complement in order to generate higher net income.  This, in turn, would ensure that the facility would appraise well for purposes of an upcoming HUD loan application.

145.   Defendant Zubkoff started a senior management meeting on January 2, 2012, with the announcement that Plaza Health had to do "whatever it takes" to increase appraisal value of Arch and Ponce facilities applying for HUD loans.  He advised the hiring of more medical directors with the words "get more doctors," and advocated "transferring Medicare patients from other facilities."

146.   In late 2011, Arch added two new medical directors, beginning to pay Dr. Alain Innocent $2,000 per month and Dr. Alain Brezault $2,000 per month, and Dr. Howard Reinfeld $3,000 per month.  This took the cadre of medical directors at Arch from three to six.

147.   These tactics worked so well that they amount to a petri dish for fraud.  As of December 2011, defendant Arch was paying $16,000 per month in medical director fees (up from about $9,000 earlier in the year), and its net income doubled, from about $35-$40,000 per month in late 2011 to $80,000 in January 2012.  And Arch's average daily Medicare census of 16 for all of 2011 was at 18 for December 2011, and 21 for January 2012.

- 36 -

148.    Thus, adding three medical directors at Arch, at a cost of around $7,000 per month resulted in a doubling of net income and a 30% increase in Medicare average daily census.

149.    The invoices for Drs. Innocent, Brezault, and Reinfeld, as well as existing Arch medical directors Hamid Keshvari-Rasti and Ivan Rodriguez, were all prepared on Arch letterhead; all include identical grammatical errors; and all include no itemization of any sort.  For example, Dr. Innocent's "invoice" says, in total:  "Invoice Co-Medical Director services for Dr. Alain Innocent, M.D. **$2,000 the month November 2011**" (emphasis in original).  The others are identical except for names and amounts.

150.    Many other internal communications and reports reflect that defendants regularly emphasized the importance of paying doctors to generate referrals.

151.    On April 12, 2007, South Pointe Plaza Administrator Bill Savett wrote Relator that "[a]s of 2/15/07 Richard Cuello, M.D. was hired as Medical Advisor, since then he has been very involved in facility, and has referred numerous residents."  Mr. Savett requested that this Doctor be paid "ASAP."

152.    On April 16, 2007, Sinai Plaza Administrator Heidi Tucker wrote Relator requesting that Dr. Toledo be paid.  She noted "[w]e are many months behind and we have not gotten any referrals from them in 3 weeks."

153.    On January 18, 2008, Risk Management Director Alex Orozco wrote Elliot Kalus regarding invoices for Dr. Ivan Rodriquez, noting "[p]lease expedite, Heidi and I want to meet with him for [M]edicare referrals and this is delaying us."

154.

## 2.  **Defendants have no meaningful compliance program**

155.    Relator's attempts to guide defendants toward compliance with federal healthcare laws and regulations were consistently rebuffed.

156.    For instance, Relator's attempts to have Medical Directors document their work, and to have their payments released only after review of the Directors' performance, were repeatedly disregarded.

157.    On July 11, 2005, Relator added a line-item to the agenda for meetings with defendant Zubkoff for "Physician documentation." He included with this agenda a checklist regarding standard compliance items, and noted that "[t]he key I believe is that the physicians must be able to document work effort. This is especially pertinent for Co-Medical Director." However, defendants have never required physicians to submit such documentation.

158.    Relator repeatedly urged defendants to perform a regular review of invoices and payments of Medical Directors. However, his efforts were treated as an annoyance and an unreasonable delay. Defendant Zubkoff instructed Mr. Beaujon that these payments were routine and to trust the administrators' review, and rubber-stamped approval. Upon information and belief, neither the administrators nor defendant Zubkoff has performed a meaningful review of the Medical Directors' per-formance in order to assure that they were being paid a market-value rate for actual performance of necessary services.

159.    On many occasions, defendant Zubkoff directed Relator not to hold up medical director payments for review.

- 38 -

160.   On January 24, 2007, he wrote Relator "[w]e need to get medical director checks on a routine basis returned to the administrators for distribution as we discussed."

161.   On February 26, 2007, defendant Zubkoff instructed Relator that "Administrators need to distribute personally and timely" in response to a query by Administrator Terry Escobar regarding the status of checks for the Medical Committee.

162.   In response to a query whether Dr. Vaca's checks could be released for payment, defendant Zubkoff replied, on or about April 26, 2007:  "[a]lready established positions shouldn't be held-up.  I'm reviewing new positions and any needed changes."

163.   On May 2, 2007, defendant Zubkoff wrote Relator:  "I met with Heidi [Tucker] this morning.  The Rehab/Medical Director invoices were reviewed and approved by her months ago and are very late being paid.  Therefore, release to Heidi today."

164.   On May 8, 2007, defendant Zubkoff questioned Mr. Beaujon's delay in payment for doctors.  "After review and approval by the administrator involved, initialed invoices should be automatically and promptly paid."

165.   On May 9, 2007, defendant Zubkoff again questioned Mr. Beaujon regarding payments to Dr. Manuel Dominguez's payments, stating: "What is the problem with routine accounts payable issues?"

166.   On April 24, 2007, Mr. Beaujon requested that defendant Zubkoff review and approve an updated list of Medical Directors for whom facilities were requesting payment.  The list contained approximately 25 doctors across seven facilities.  The

defendants paid these doctors monthly fees totaling $43,500.  Defendant Zubkoff refused to review the list.

167.   On November 29, 2007, Mr. Beaujon asked defendant Zubkoff to review a list of current Medical Directors with facility check requests.  There were approximately 33 Medical Directors at the eight facilities, paid a total of $64,300 each month.  He requested Defendant Zubkoff to review before checks were issued noting, "[e]specially problematic is South Pointe which has 8 doctors for 19,000 per month—That seems excessive to me—Are you confident that these doctors are doing medical director services to justify that."

168.   Defendant Zubkoff replied and directed Relator to "[s]end directly to the eight administrators for their review and approval.  The facility administrators are responsible for the details and the process at their individual facility.  If there are any remaining questions, refer to me."

169.   On January 29, 2008, Relator provided defendant Zubkoff a list of Medical Directors per facility as of January 22, 2008.  There were approximately 34 Medical Directors at the facilities, paid a total of $65,300 each month.  Relator requested that defendant Zubkoff sign to indicate his approval.  Defendant Zubkoff refused.

170.   On January 14, 2008, Mr. Beaujon wrote to the Board's "Compensation Committee," which consisted of Russell Galbut, Marvin Greenwald and Irwin Roth, with copies to Elliot Kalus and defendant Zubkoff:

> "I believe one of the key items that needs to be addressed at the compensation committee meeting Wednesday is the determination as to the existence of conflict of interest of executive employees subject to review by the Compensation Committee.  It is normally considered crucial by most (ours should be no exception) organizations—that its executives

- 40 -

are not conflicted.  Therefore, all executives subject to compensation Committee review should disclose any other employment or consulting or any other business arrangements they may have with any other entities. **Of special importance is a financial relationship with entities that the Network would admit or discharge patients to or conduct any other business with –e.g. Hospitals, Doctors, etc... as that relationship could very well be in violation of Medicare law, Healthcare regulations as well as tax law as their compensation could very well be deemed to be unreasonable especially if they were to leverage off their relationship with the network for personal benefit from other entities not to mention the fact that salary surveys assume Full Time employment.   Needless to say the Medicare/Healthcare regulatory implications of such an arrangement would be considerable.**"

Emphasis supplied.

171.    Upon witnessing the increase throughout 2007 in defendant Zubkoff's business model of increasing Medicare census by increasing the number of doctors paid to be "directors," Mr. Beaujon redoubled his efforts to secure compliance.  In 2008, he endeavored to form an *ad hoc* compliance committee which consisted, in addition to Mr. Beaujon, of Elliott Kalus and Marvin Greenwald.  He drafted a 33-page Compliance Plan and he, Mr. Kalus and Mr. Greenwald arranged to visit with the management staff at each of defendants' eight facilities to discuss the requirements and importance of compliance, but were able to complete only three or four such meetings.

172.    As part of those visits, Mr. Kalus directed each facility administrator to provide copies of their Medical Director agreements and payments.  In these meetings, the Committee determined that each administrator strongly believed that the Medical Director arrangements were specifically intended and designed to generate Medicare referrals; that many directors did not have written contracts; and that neither the market value of the compensation paid nor physician performance to contract requirements was meaningfully evaluated.

- 41 -

173.   In early 2009, Relator, Kalus and Greenwald requested Russell Galbut to meet with them regarding an urgent compliance matter.  Mr. Galbut responded that he was available to meet.  They set up a meeting for that same day.  Earlier that day, Mr. Kalus had written Relator and Mr. Greenwald regarding the invoices for consultant Rafael Nodal.  He noted they had been approved by Zubkoff but have "questions falling under non compliance."  He also wrote that there were invoices from the University of Miami for services going back 3 months that also had noncompliance issues.  Relator wrote back that they were illegal.  Relator also wrote that he objected to these transactions and "others like Dr. Peppard and other non compliant med dirs.—A report needs to go to the general board informing them—agree??"  Relator, Mr. Kalus, and Mr. Greenwald met with Mr. Galbut and informed him of their concerns regarding the payments to Mr. Nodal, University of Miami, and Medical Directors.

174.   On February 4, 2009, Relator, Elliot Kalus and Marvin Greenwald presented to Russell Galbut findings for the year 2008, including concerns regarding non-compliance items.  These findings were also presented to the entire Board.  The self-titled Compliance Committee viewed their major objective to evaluate the Medical Directors' documentation regarding performance and accountability.  Mr. Kalus reported:

> [P]rior to visiting the centers we sent an email of our latest medical directors listing and payments.  We requested the administrators reply if they are still active at their facility and performing and accounting as per their agreement.  To notify us if there are any changes to be made next to the listed name.  We compared the returned list to the agreements we had in the file.  There were several missing agreements.  The administrator was asked to email us a copy.  On our in person visit we were told that some doctors were placed in the centers at the request of our president and CEO.  The requested doctors were known 'as good referrals for the

centers.' At staff meetings our president and CEO would openly discuss the doctors referrals to the centers.

He also reported:

> Our president and CEO recruited a doctors business mgr that 'can produce referrals'. The meeting with the chairman was needed as the president and CEO was the part being discussed as being out of compliance due to the above. When the consultant submitted his request for reimbursement it was not only a high price (Joes Stone Crab restaurant) $450.00, but the guests were our centers mktg staff! The other receipts were also questionable. Two or three were shown as discussed referrals with doctors name and for the named facility. This wrong doing was approved by our president. When brought to his attention that this was wrong full act was approved by him he called the consultant to take the receipts back, leave off the referral words and re submitfor payment.

175.   In approximately April 2009, Eyta Brafman was hired to take over compliance duties and to spearhead related-party real estate transactions based on incorrect appraisals.

176.  The appraisals were noncompliant with commercially- reasonable fair market value real estate transactions to which Relator had previously objected, and which were intended to serve as a vehicle to lock in HUD financing.

177.   These purchase prices and the resulting HUD financing were dependent on the medical-director kickback and therapy schemes detailed herein, because inflated income to the SNFs—especially those being purchased—were crucial to the purchase and financing process at the highest possible appraisals and ultimate HUD financing for those related parties who were the beneficiaries and whose decision it was to hire Ms. Brafman.

- 43 -

178.   Ms. Brafman had neither qualifications nor experience in healthcare compliance, and Relator believes that her husband may have had a financial interest in a property purchased by defendant Hebrew Homes.

179.   Relator and Mr. Kalus met with Ms. Brafman to provide her with the compliance materials Relator had created, and they provided her with information regarding the kickback arrangements with medical directors.  However, Relator is aware of nothing to indicate that Brafman in any way used these materials.  She did institute a new contract that newly-recruited medical directors signed, and the form contract required them to keep records of their performance.  However, Mr. Beaujon knows of nothing to show that defendants have enforced this provision.

180.   After these events, Mr. Beaujon's role in the process of approval of payments to medical directors was eliminated, with invoices paid almost immediately at the direction of defendant Zubkoff.

181.   Ms. Brafman not only failed to institute proper compliance procedures, but did not even maintain the compliance system in place before she was hired.  In particular, Relator has never seen any time records submitted by medical directors.

182.   Recent invoices confirm that defendants have not implemented any meaningful compliance changes.  Defendants continue to pay physicians without regard to performance of actual duties.  Physician invoices, when submitted, confirm that physicians do not report on performance of duties or time spent.  Rather, invoices demand payment for nothing more than membership in a "medical committee," or, quite often, simply for "services rendered" as a Medical Director.

- 44 -

183. Medical directors often submit these invoices at the beginning of the month before such "services" could have been rendered.

184. Many "invoices" are actually issued by one of the facilities to itself, apparently without even being reviewed by the physicians. Mr. Beaujon's objections to these obviously-fraudulent invoices were ignored.

185. Payments made to Medical Directors by Hebrew Homes far exceed any fair market value of services actually provided or documented.

186. Payments are unrelated to commercial reasonableness. Medical Directors are paid based on submission of form invoices, with no evidence of any time actually spent in exchange for the payments. Defendants routinely pay invoices with no more than a generic descriptions of work performed, and make no substantive review that work had had actually been provided.

187. The following paragraphs describe invoices which have been supplied by Mr. Beaujon to the United States. They are believed to be representative of all invoices which formed the basis for payments by defendants to physicians.

188. On November 1, 2004, Dr. Francisco Gonzalez-Abreu submitted an invoice to Ponce for "Member of Medical Committee" for the Month of November 2004. As detailed below, Ponce submitted similarly vague invoices in his behalf in 2008 and 2010.

189. Ponce also submitted vague invoices on behalf of Dr. Tony Abbassi in 2008. Also, on May 1, 2009, Dr. Abbassi submitted an invoice to Jackson "[f]or services rendered for the month of May 2009" in the amount of $5,000. On June 1, 2010, he

- 45 -

again submitted a letter invoice to Jackson in the amount of $7,500 "for services rendered on June 2010."

190.   Dr. Ignacio Cendan submitted an invoice for "September 2007 Directorship $2000" to Hebrew South.  Similar, if not identical, invoices were submitted for October and November 2007.

191.   Dr. Onel Corrales submitted an invoice for "Medical Services" at Jackson for the month of May 2009 and again in March 2011.

192.   On April 15, 2007, Dr. Richard Cuello submitted a "South Pointe Plaza Medical Advisory Board Member Invoice" in the amount of $4,000.  In March, 2009, he submitted an invoice that merely stated "Amount Due: $4,000."  On June 2, 2009, he submitted an invoice for "Medical Director Services for South Point Plaza May 2009" in the same amount.  On February 18, 2010, Dr. Cuello submitted an invoice for "services of supervising physician, Medical Director for Jan, 2011" in the amount of $2,000.

193.   On April 1, 2009, Dr. Dagmar Lemus submitted an invoice to Jackson "for services rendered for the month of April."

194.   On May 1, 2009, Dr. Manuel Dominguez submitted an invoice for "Medical Director Service at Jackson Plaza for the Month of May 1, 2009" in the amount of $2,500.  He submitted an invoice with an identical description for the month of May, 2010 on May 1, 2010.

195.   On August 30, 2004, Manuel Ojeda submitted an invoice to Hebrew South in the amount of $1,500 for "Monthly Board Member Invoice."  He submitted an invoice with an identical description on August 30, 2007 to South Point in the amount of $4,000 and again on February 28, 2009. On January 1, 2008, he submitted an invoice to Ponce

for "medical director" in the amount of $3,000.   As shown in paragraph 196, Ponce submitted similarly-vague invoices on his behalf in 2011.

196.   On May 1 and June 1, 2008, Rafael Palmerola submitted invoices "[f]or Service: Medical Director Services for South Pointe Plaza" in the amount of $4,000 for each month.  On May 12, 2009, he submitted an invoice for "medical director services for current month of invoice May 2009" in the same amount.

197.   In or around June 2007, Dr. Peppard submitted invoices for "services" to South Pointe and to Jackson for April, 2007 and May, 2007 in the amount of $2,000 for each month for each facility.  He also submitted similar invoices for September and December 2007 to Ponce and for October 2007 to South Pointe in the amount of $2,000 for each month.  In 2009, he continued to submit the same invoices—to South Pointe for March 2009 and April 2009.

198.   Jason Radick submitted an undated handwritten invoice for himself on Hebrew Homes letterhead for Sinai for "Medical Director fee" in the amount of $2,000 for the month of December.

199.   Dr. Raphael Soto submitted an invoice for "c/o Medical Director" for May 2009 to South Pointe.

200.   Dr. Toledo submitted "fees for services rendered as Rehabilitation Medical Director" on December 5, 2006 for the previous nine months and in advance, for December, 2006.  He similarly requested fees "for services rendered as Rehabilitation Medical Director" for the months of January and February, 2007 on February 20, 2007.

201.   On October 20, 2004, Dr. Carlos Vaca submitted a letter invoice requesting payment "for professional service rendered to [Jackson Plaza]" for the month

of September, 2004. He submitted similar invoices on March 23, 2009 for the months of January, February and March, 2009.  On March 15, 2010, he submitted a letter invoice requesting payment "for professional service rendered to [Jackson Plaza]" for the month of March, 2010.

202.    On November 1, 2004, Dr. Ramses Vega submitted an invoice to Ponce for "services rendered as a Medical Director and a member of the medical committee for the current month."

203.    On or about October, 2008, Dr. Luis Veras submitted invoices for "Co-Medical Director Services for South Pointe Plaza" for the months of May, June, July, August and September 2008 (although dated for the first of each month, stamped received in October 2008).  On May 12, 2009, he submitted an invoice to South Point for "Medical Director services for current month of invoice May 2009."

204.    Examples of the facilities themselves "submitting" invoices *to* themselves include creation and "submission" by Ponce of invoices for Dr. Francisco Gonzales-Abreu on November 1, 2004 and Dr. Terrance Peppard on May 1 and June 1, 2007.  It submitted such invoices dated January 1, 2008, for the month of January 2008 for Drs. Tony Abbassi, Juan Abreu, Humberto Fernandez-Miro, Francisco Gonzalez-Abreu, Jorge Gonzales, Jose Nunez, Manuel Ojeda, Francisco Pages, Rafael Palmerola, and Terrance Peppard.

205.    In March 2008, Ponce "submitted" invoices dated February 1, 2008 for the month of February 2008 for Drs. Tony Abbassi, Juan Abreu, Francisco Gonzalez-Abreu, Fernandez-Miro, Jorge Gonzales, Jose Nunez, Manuel Ojeda, Francisco Pages, Rafael Palmerola, Terrance Peppard, and Luis Veras.

- 48 -

206.   On or about March 18, 2008, Ponce prepared and "submitted" invoices for the month of March 2008 for Drs. Fernandez-Miro, Jorge Gonzales, Jose Nunez, Manuel Ojeda, and Terrance Peppard.

207.   On June 1, 2010, Ponce "submitted" invoices for Dr. Armando Falcon and again for Dr. Falcon on January 1, February 1, and March 1, 2011.

208.   On May 1, 2010, Ponce "submitted" invoices for Drs. Francisco Pages and Francisco Gonzales-Abreu.  On February 1 and April 1, 2011, it submitted invoices for Dr. Manuel Ojeda.

209.   There is nothing to indicate that the doctors reviewed any of these invoices.

210.   These invoices reflect that Hebrew Homes never changed its policies from 2004 through the present.  When it did purport to require invoices, it did not require any description of services beyond that of "Medical Director" or "Committee Member."  It did not require the doctors to account for time spent, or to wait for the end of the month to bill for "services rendered."  Over Relator's frequent objections, Hebrew Homes paid the Medical Directors as a matter of course.  This lack of documentation, coupled with lack of review, demonstrate the unreasonableness of Hebrew Homes' payments to physicians.

211.   Moreover, defendants unreasonably engaged several Medical Directors for each facility, for essentially-identical, with no relationship to the legitimate needs of the facility.  For instance, the chart below demonstrates how many Medical Directors Defendants paid for the years 2007-2010 at five facilities:

- 49 -

| Facility | 2007 | 2008 | 2009 | 2010 |
|----------|------|------|------|------|
| Arch | 3 | 6 | 6 | 4 |
| Ponce | 8 | 10 | 9 | 8 |
| Sinai | 7 | 8 | 5 | 5 |
| SouthPointe | 9 | 5 | 4 | 7 |
| Jackson | 5 | 6 | 6 | 5 |

### D. Defendants offered many other illegal incentives to physicians

212.   Defendants offered and paid many other illegal incentives in order to secure referrals, orchestrating an early intervention scheme and engaging a consultant to provide gifts and entertainment to physicians in exchange for referrals.

#### 1.   "Early intervention" scheme

213.   Defendants regularly discharge patients to hospitals and home care so that the physicians who referred them could bill Medicare at higher rates.

214.   Defendants employed up to eight corporate nurses at a time, run by Director of Nursing Joyce Galbut, who is married to defendant Zubkoff.

215. Upon information and belief, Ms. Galbut's primary activity was to study charts and find patients to send to hospitals. Upon information and belief, these decisions were made without regard to medical necessity.  Rather, the decisions were made as a *quid pro quo* in order to secure referrals from physicians.

### 2.    Consultant services

216.    Defendants engaged a consultant, Rafael Nodal, to increase Medicare referrals by developing relationships with physicians from at least January, 2008 to December, 2010.  He was initially paid a monthly fee of $2,500 for these services; his monthly fee is now $5,000.  His invoices reflect that his work involves frequent meetings with physicians.  At times, his description specifically referenced the analysis of patient referral sources or meeting with a particular doctor regarding patient referrals.

217.    Nodal often submitted, and received, reimbursement for expenses incurred entertaining physicians.  For example, on November 13, 2008, he submitted "Expense Report 1" for reimbursement of expenses totaling $2,953.56.  Six receipts specifically identified lunches or dinners purchased for physicians for the purpose of "referrals."  When Mr. Kalus objected to defendant Zubkoff, Zubkoff instructed Nodal to take back the receipts and resubmit them, removing the description "referral" from the receipts.  Defendant Zubkoff arranged for Mr. Nodal to be paid.

218.    Nodal requested reimbursement for $210.59 at Houston's for lunch with Drs. Lemus, Paola, and Gaby (healthcare coordinator) from Ponce; $486.45 for Joe's Stone Crab for lunch with Dr. Ojeda, Don Woody and Vanessa from Hebrew South and Judy from South Pointe; $207.25 at Casa Paco for dinner with Dr. Ivan Rodriguez; $16.63 for lunch with Dr. Ojeda; $78.52 at La Carreta for lunch with Drs. l/n/u; $21.06 for dinner with Dr. Ojeda; $93.54 at Janiella Restaurant for lunch with Dr. l/n/u, Dr. Garcia and Desiree Santiago from Ponce; $47.47 at Rancho Luna for lunch with Dr. Albert and Ana Elvis from Jackson; $143.02 for dinner with Dr. Rigabato-Rodriguez; $236.69 for lunch with Dr. l/n/u and others from Ponce; $175.70 for dinner with Dr.

Rodriguez; $28.99 for lunch with Dr. l/n/u for Aventura; $207.20 for dinner with Dr. Estrada;$86.63 for dinner with Dr. l/n/u; $33.92 for lunch with Dr. Gonzales; and $426.94 for dinner with Dr. Bombino, Dr. l/n/u, Dr. Sanchez and Dr. Rodriguez.

219.   Nodal routinely submitted receipts requesting and receiving reimbursement from defendants for entertaining physicians in order to gain referral business.  These activities were not just known to defendants, but were the *sine qua non* of their relationship with Nodal.

**E.    Defendants' Intended result: referrals**

220.   Defendants' schemes resulted in increased numbers of admissions into their facilities.

221.   For example, from January 2007 through the first ten months of 2009, medical directors referred approximately 53% (2007), 71% (2008), and 64% (2009) of the patients admitted to its facilities.  The majority of those patients were beneficiaries of federally-funded healthcare programs.

222.   In exchange for these referrals, defendants paid remuneration to its directors.  These payments, typically in the form of a monthly stipend, were above fair market value and were not commercially reasonable.

223.   For example, in 2007, when he was not a medical director paid by defendants, Dr. Tony Abbassi made seven referrals to Jackson.  In 2008 and 2009, Dr. Abbassi was under contract as a Medical Director for Jackson and received $60,000 and $75,000, respectively.  He referred 117 patients to Jackson in 2008 and 96 in 2009.

224.   Dr. Richard Cuello made 66 referrals to defendants' facilities in 2007.  In 2008 and 2009, Dr. Cuello was a Medical Director for South Pointe and received

$48,000 and $40,000, respectively.  He referred 117 patients to Defendant facilities in 2008 and 95 in 2009.

225.    Dr. Armando Falcon did not make referrals to Defendant facilities in 2007 or 2008. In 2009, he was a Medical Director for Ponce; received at least $19,500; and referred at least 39.

226.    Dr. Dagmar Lemus did not make any referrals to Defendant facilities in 2007. She was a Medical Director for defendants in 2008 and 2009 and received $6,000 and $8,000 respectively.  She made 16 referrals in 2008 and 40 in 2009.

227.    Dr. Ivan Rodriguez made only 32 referrals to defendant facilities in 2007— a time when he was not a paid medical director.  Dr. Rodriguez was a Medical Director for Defendants in 2008 and 2009 and received $30,000 and $27,500 respectively.  He made 132 referrals in 2008 and 102 in 2009.

228.    Dr. Luis Veras made only five referrals to defendants' facilities in 2007. He was a Medical Director for defendants in 2008 and 2009 and received $56,000 and $48,000 respectively.  He made 51 referrals in 2008 and 35 in 2009.

229.    While a paid Medical Director in 2007 and 2008, Dr. Jorge Gonzales made 63 and 20 referrals, respectively.

230.    While a paid Medical Director in 2007-2009, Dr. Onel Corrales made 82, 85, and 88 referrals, respectively.  Dr. Manuel Dominguez made 72 referrals in 2007, 80 in 2008, and 48 in 2009.  He was paid $87,500 as a Medical Director from 2007-2009.

231.    Dr. Ivan Jonas made 96 referrals in 2007, 111 in 2008, and 103 in 2009. He was paid $146,500 as a Medical Director from 2007-2009.

232.   While a paid Medical Director in 2007-2009, Dr. Jose Nunez made 33, 32, and 29 referrals, respectively.  He was paid $36,000 as a Medical Director from 2007-2009.

233.   While a paid Medical Director in 2007-2009, Dr. Manuel Ojeda made 429 referrals in 2007, 282 in 2008, and 266 in 2009.  During this three-year period when he referred 977 patients, Dr. Ojeda was paid over $200,000.

234.   While a paid Medical Director in 2007-2009, Dr. Fransisco Pages, a psychiatrist, made 30 referrals.  He was paid approximately $36,000 as a Medical Director from 2007-2009.

235.   While a paid Medical Director in 2007-2009, Dr. Rafael Palmerola referred 222 patients to defendants.  He was paid $117,000 as a Medical Director.

236.   While a paid Medical Director in 2007-2009, Dr. Jason Radick referred to defendants 205 patients.  He was paid $105,000 as a Medical Director from 2007-2009.

237.   While a paid Medical Director in 2007-2009, Dr. Rafael Soto referred 216 patients to defendants.  He was paid $72,000 as a Medical Director from 2007-2009.

238.   While a paid Medical Director in 2007-2009, Dr. Carlos Vaca referred 97 patients to defendants.  He was paid $72,000 as a Medical Director.

**F.   Improper Billing for Therapy Services**

239.   Defendants improperly inflate their reimbursement under Medicare and other federally-funded healthcare programs by preparing false MDS forms which result in billing for the provision of medically unnecessary services; billing for the provision of unskilled services; billing when no service has been performed; and result in the billing

for individual therapy when group or concurrent is performed and falsifying records such as therapy logs to support bogus claims.

240.    In early 2007, defendant Zubkoff added the position of "Coordinator of Rehabilitation Services" to the portfolio of his consultant, Herman Epstein.

241.  Mr. Epstein has no medical background, no physical therapy background, and so far as Mr. Beaujon knows, no relevant background of any sort.  Additionally, he was convicted in the late 1990s of securities fraud relating to a boiler-room operation targeting elderly victims with stock swindles.

242.  Defendants have afforded Epstein plenary control over their therapy programs, with an intense focus on maximizing revenue.  Relator has objected consistently to Mr. Epstein's involvement in these programs, both due to his lack of training and expertise and his background. Mr. Epstein's involvement in directing the plans of care for patients is improper, because he has no professional training or certification in the provision of therapy.  Despite this lack of expertise, he has enacted schemes that encourage therapists to maximize RUG categories and minimizes the actual care provided.

243.    By way of example, these schemes include the recording of fictitious minutes of care provided to patients.  Relator has repeatedly recommended that defendants require therapists to maintain contemporaneous records of time spent in providing service, as an accountability measure and a reasonable business practice. Rather than ensuring that detailed time records of therapy services are created, however, Mr. Epstein insists on using logs that do not provide accountability.

244.   In order to facilitate the provision of "therapy" to many patients simultaneously, Mr. Epstein, with defendants' concurrence, has purchased numerous therapy-related machines.  Patients are left unsupervised on exercise machines while minutes are accumulated and recorded in violation of therapy regulations, thus producing both excessive RUG categories and minimizing therapy staff costs.  Not only does financial analysis of therapy revenues and costs bear this out, but Mr. Epstein has also bragged on the Internet about the financial effect of his techniques and how RUG categories are maximized.

245.   The schemes identified in this section generated an inappropriate increase in RUG scores, particularly in the RU category, which increased well in excess of statistical averages.  Despite rule changes involving concurrent and group care, the facilities have managed not only to increase RUG scores but have maintained minimal cost increases.

246.   Mr. Epstein's almost immediate focus on higher RUG categories is evidenced by the following email:

> Will review with Heidi and her team with Nellie this week hopefully how she has 42.5% ultra patients. Others say it [is] her good patient base. While that is true, I don't think it's the whole answer. I believe that her MDS and DON play a role in this. I will see when we meet.

> EVEN Bill Savett called me this morning to ask if we can get Wesley So to his place and is meeting Nellie today to get full coverage till early evening every day. In short, the sleeping giant has awaken[ed] and there will be improvement.

247.   In February 2007, Epstein was involved in revamping the South Pointe rehabilitation department.  On February 15, 2007, fellow consultant/Rehabilitation Director Nelly Anderson sent him an update that included a plan to hire a PTA to cover

- 56 -

in the afternoons, and to have South Pointe covered from 7:00 a.m. to 6:00 p.m.  She also held a meeting with the rehabilitation department to discuss maximizing the RUG score.  In reporting to Zubkoff, Galbut and others, Epstein described this email as "the fruits of my labor."

248.    Mr. Epstein also kept close track of the Medicare monthly billing rate of each facility.  He has described this as "a very [good] tool for me to use with the Administrators."

249.    For instance, on July 10, 2007, he congratulated Heidi Tucker on reaching a Medicare rate exceeding $471, noting "rehab can do it for you."  He then exhorted, "[n]ow I want to see the restorative rehab with nursing play an up and coming role.  This will increase your LOS [length of stay] by 1-3 weeks and have important impact on your census for the appropriate patients who require the low restorative therapy."

250.  On July 10, 2008, Mr. Epstein wrote regarding Ponce that the "Medicare rate hit $484!"

251.    In response to objections from Plaza's accounting department regarding how therapists record time, Mr. Epstein stated that "[t]he administrators see the records as well and are not complaining and see their rehab billings, length of stay and Medicare rate going up.  I am not going to change a system that is effective and produces what it is supposed to be doing."

252.    The accounting staff observed that therapists reported more than 40 hours of work per week.  For instance, Heather Mendez reported and was paid for 80 hours at Sinai and 80 hours at South Beach during the same two-week period.

253.    Other therapists, including at least Chris Cutaia, were paid 80 hours salary at a Plaza facility and paid as independent contractors at other facilities during the same pay period.

254.    Abnormal payroll practices among therapists has created significant accounting and payroll-management problems because of "special arrangements" that Mr. Epstein has created for therapists, who are not required to and do not document the time they spend at Plaza facilities.

255.    When Relator objected to the failure and refusal to track therapists' time, Mr. Epstein successfully opposed his efforts. As an example, in November, 2009, Relator tasked a member of the accounting staff to verify that the Jackson facility was recording and paying therapists for time based on when the employees were punched in and out in order to ensure proper oversight. Relator had been attempting to ensure all the facilities recorded therapists' time in this manner. The results of the audit of Jackson for selected therapy employees uncovered that Relator's efforts were entirely ignored:

a.      Roosevelt Moore:  He is setup in Kronos with automatic salaried hours – 80 hours.  He did not punch in and out.

b.      Julie Chau:  She had all of her 80 hours added by Lury Ow.  She did not punch in and out.

c.      Lisa Dyke:  No hours.

d.      Marie E. Casenas:  She had all of her 80 hours added by Lury Ow.  She did not punch in and out.

e.      Paulina Claro:  She had all of her 20 hours added by Lury Ow.  She did not punch in and out.

256.   Relator e-mailed the Jackson administrator on December 7, 2009, that "there must be tracking of therapist time actually spent in the [building] which is consistent with how therapists are paid and supports billing."  This has never occurred.

257.   Mr. Epstein's descriptions for his consultant invoices confirm that he considered it part of his duties to have "reimbursement discussions" or "RUGs resolution" or review rehabilitation reports with facility staff including MDS preparation to maximize reimbursement as well as addressing regulatory compliance and clinical issues as well as staffing and other basic therapy concerns.

258.   Mr. Epstein's role in managing the rehabilitation services program was established by defendant Zubkoff, who reviewed and approved Mr. Epstein's invoices on an ongoing basis.

259.   Epstein's bill for the period from July 15 to August 14, 2011 demonstrates the breadth of his involvement in defendants' therapy operations.  It bills for 75 hours, for this list of activities:

> Ongoing Services included staff meetings with administrators and healthcare co-ordinators for marketing, marketing meetings with physicians, continued discussions for HUD financing for Arch Plaza, Ponce Plaza and University Plaza, discussions with Rehab staff re use of software, continuing discussions with Giftwrap to use as our rehab software with a Webinar in service for the new CMS guidelines, **continued MDS 3.0 discussions with staff and management regarding rehab assessment/therapy commencement, including discussion regarding the CMS changes to be effective October 2011,** management meetings, direction and staffing of the program for rehab treatment at each facility, facility, rehab equipment utilization, continued in-service meetings with administrators, Rehab Staff, MDS, DONs, and Health Care Coordinators, monitoring and review with administrators and rehab coordinators of status reports on the rehab program at each facility and inspections, marketing strategy meetings with administrators, planning and implementation of management policies, attendance at and strategic planning with Board, review of financial statements, discussions

for new constructions, **in-service with rehab dept and business office management personnel and follow through, creation of new therapy logs,** marketing, Internet web site, on-going fund raising and community activities planning meetings with T2 Marketing, introduction to and preparation for training and presentation of the Tibion bionic leg, etc.

260.    Epstein's constant focus on increasing the RUG rate for Medicare reimbursement has resulted in defendants' billing the United States for medically-unnecessary services.  On several occasions, Relator personally observed unattended patients asleep on the machines.  Upon information and belief, defendants recorded therapy minutes which resulted in Medicare being billed for the provision of services that were not rendered.

261.    Mr. Beaujon believes that defendants recorded and billed for therapy services when none had been performed.   He was informed that Plaza therapists actually work at other, unaffiliated facilities in the afternoon.  For example, in the month of November, 2011, Therapist Nelly Anderson signed logs that indicated she oversaw therapy delivered by two assistants, Yolanda Suarez and Faith Wilpon.  Out of 21 days in November that Ms. Suarez logged therapy minutes, she logged more than eight hours on three days.   Of 22 days that Ms. Wilpon logged therapy minutes, she logged more than eight hours on 18 days.  While it is possible to log those hours if engaged in concurrent therapy, these hours were logged as individual therapy.

262.    Relator is also aware that defendants billed based on inaccurate MDS (Minimum Data Set) for individual therapy when group or concurrent therapy was performed, based on inaccurate therapy logs.

263.    On several occasions, Relator personally observed more than two patients at a time being provided services by a single therapist or therapy assistant.  However,

after October 2010, SNFs could only bill concurrent therapy of no more than two patients and that time had to be split between them.

264.   Despite the changes relating to the regulation of concurrent therapy, Relator observed that concurrent therapy continued to be the norm, but was yet recorded as individual on logs. Moreover, the operating costs of the facility and the Medicare billing statistics did not significantly change, indicating that there was no change in the operating methods relating to therapy services.

265.   After October 2011, SNFs could only bill group therapy of no more than four patients and that time had to be split between them.  For example, an hour of group therapy provided to four patients must be billed as 15 minutes to each of them.

266.   Despite this change Relator continued to observe more than four patients being provided services by a single therapist or Aide at a time.  These observations are confirmed by the facts that that neither the operating costs of the defendant facilities nor their Medicare billing statistics changed significantly, even though therapy delivery rules did.  As the chart below indicates, the costs from year to year did not significantly increase.

267.   In fact, for Arch Plaza, during the quarter ending December 31, 2011, while the RU Rugs category increased to approximately 74%, the Medicare Therapy cost per day remained at $53.48.  This amount is nearly identical to the cost for the Fiscal year ended September 30, 2009--before the restrictions imposed on concurrent care were enacted.  Were the facility compliant regarding the use and reporting of concurrent care, this result would be essentially impossible.

268.    The most-recently-reported national average for the RU Rugs category is 46.7%, compared with defendants' 74% rate.  Thus, defendants RU billings are nearly 40% higher than average.  There is no non-fraudulent explanation for this fact.

269.    Relator has visited the therapy rooms at defendants' facilities and witnessed numerous patients occupying an assortment of therapy machines supervised by a minimal number of staff.

270.    On at least one occasion he witnessed one nurse's aide supervising many patients on machines.  Medicare Pub. 100-2, Chapter 15, Section 230.1.C states: "[s]ervices provided by aides, even if under the supervision of a therapist, are not therapy services and are not covered by Medicare. "   Defendants' publicity brochures even display a picture of an aide working apparently unsupervised with a patient.

271.   The following table shows that the Arch, Jackson, and Ponce PPD rates have increased for each of the past two years, notwithstanding the new concurrent therapy restrictions:

| Facility | Fiscal Year 2010 PPD rate | Fiscal Year 2011PPD rate | Fiscal Year 2012 PPD rate (annualized using 10/31/2011 data) |
|---|---|---|---|
| Arch | $53.00 | $54.24 | $56.94 |
| Jackson | $64.87 | $66.85 | $76.72 |
| Ponce | $55.57 | $59.32 | $66.70 |

Similarly, the Medicare billings did not decrease, and RUG categories have continued to trend higher despite a major increase in therapy staffing required by new healthcare regulations.

| Facility | Fiscal Year 2010 PPD rate | Fiscal Year 2011PPD rate | Fiscal Year 2012 PPD rate (annualized using 10/31/2011 data) |
|---|---|---|---|
| Arch | $493.19 | $590.14 | $581.58 |
| Jackson | $503.57 | $588.61 | $583.59 |
| Ponce | $518.29 | $614.47 | $603.11 |

272.   These circumstances contribute to defendants' providing inaccurate information to the MDS coordinators regarding the amount of therapy time spent with patients.  This, in turn, improperly inflates the RUG categories and results in the submission of false claims for higher Medicare reimbursement than the law and regulations permit.

273.   The following table shows the percentage of several facilities' Medicare billings in the "RU" ("ultra-high") category.  It shows that billings at the highest utilization category have greatly increased despite their having been no change in the patient mix which would require or justify these increases, and costs had increased only minimally.

| Facility | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| Arch | 16% | 22% | 45% | 58% | 64% | 68% |
| Jackson | 15% | 32% | 55% | 64% | 70% | 72% |
| Ponce | 14 % | 36% | 63% | 81% | 78% | 66% |

274.   In addition, the average daily revenue  received on account of each Medicare patient greatly increased for each calendar accounting year:

| Facility | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Arch | $469 | $468 | $517 | $569 |

| Ponce | $489 | $523 | $546 | $585 |
| Sinai | $477 | $478 | $521 | $586 |
| Jackson | $465 | $491 | $523 | $573 |

275.    For the Ponce facility, in 2007, defendants submitted claims for payments in the amount of $5,431,137 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.  In 2008, defendants submitted claims for payments in the amount of $6,895,165 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.  In 2009, defendants submitted claims for payments in the amount of $6,261,075 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.   In 2010, defendants submitted claims for payments in the amount of $8,140,348 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.

276.    For the Jackson facility, in 2007, defendants submitted claims for payments in the amount of $3,151,804 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.  In 2008, defendants submitted claims for payments in the amount of $4,155,053 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.  In 2009, defendants submitted claims for payments in the amount of $4,672,716 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.  In 2010, defendants submitted claims for payments in the amount of $4,700,134 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.

277. For the Sinai facility, in 2010, defendants submitted claims for payments in the amount of $5,770,976 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.

278. For the South Beach facility, in 2007, defendants submitted claims for payments in the amount of $4,443,546 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts. In 2009, defendants submitted claims for payments in the amount of $5,421,717 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts. In 2010, defendants submitted claims for payments in the amount of $5,221,862 for its Medicare patients' PPS amounts, which reflect inflated RUG amounts.

279. Relator has analyzed the total Medicare billings for Plaza facilities for calendar years 2008-2011 These billings total $129,904,049. In 2008, the total Medicare billing by defendants was $29,007,254. In 2009, the total Medicare billing by defendants was $31,493,122. In 2010, the total Medicare billing by defendants was $32,435,210. In 2011, the total Medicare billing by defendants was $36,968,463.

280. Defendants have no meaningful compliance program relating to therapy services. At a management meeting on or about September 8, 2011, Ms. Brafman stated that she was reluctant to implement compliance procedures relating to therapy services, because it would have a negative effect on the real-estate appraisals which were the original reason for her being hired by defendants. No one at the meeting directed Ms. Brafman to implement proper therapy compliance procedures, and Mr. Beaujon has seen no evidence that such procedures have been implemented.

281.    Mr. Beaujon had been led to believe that Ms. Brafman was to make the development of professional therapy policies and procedures a priority given her position and prior emails and discussions; however, this has not proven true.

### G. Defendants' false billings were intended to and did cause misrepresentations to HUD in order to obtain preferred financing in amounts which would not have been available to them absent their frauds

282.    Defendants used their medical-director and therapy-inflation schemes to artificially inflate the value of the physical properties, in furtherance of a scheme to secure HUD-insured loans at more favorable rates than could be secured on the open market and to provide grossly inflated compensation to related parties.

283.    In 2006, defendants purchased Jackson from a related entity.  Shortly thereafter, they applied for a HUD-insured refinancing pursuant to Section 223(f) of the National Housing Act and received favorable low-interest rates.

284.    In 2010, Defendants purchased Arch and Ponce from a related entity at an artificially inflated price.  Defendants are currently in the process of re-applying for a HUD-insured refinancing pursuant to Section 223(f) of the National Housing Act, their first application having been rejected.

### H. Defendants knew that the admissions resulted in claims to federally-funded healthcare programs

285.    The admission of patients referred by the physicians to whom defendants pay kickbacks in the form of "medical director" salaries result in the submission of false claims to federally-funded healthcare programs, including at least Medicare and Medicaid. These false claims include both the claims submitted by the facilities and the claims submitted by the physicians.

- 66 -

286.   Defendants knowingly submit and cause the submission of false claims to the United States for care of patients at its facilities performed on Medicare, Medicaid and other federally-funded patients.

287.   Based on Relator's position in the company, he is personally aware that Hebrew Homes' paid relationships and false billing of therapy services are ongoing.

288.   Defendants know they are violating the AKS and Stark laws by their actions to pay illegal incentives in order to influence the judgment of physicians and cause the referral of patients, including Medicare, Medicaid, and other federal program patients, to their facilities.

289.   Defendants know that their offer and payment of illegal incentives have the foreseeable result of causing the submission of false claims to Medicare, Medicaid, and other federally-funded programs.

290.   Defendants know that their billing for improper therapy services, whether medically unnecessary, unskilled, not provided, or mischaracterized as individual, violates the False Claims Act and has the foreseeable result of causing the submission of false claims to Medicare, Medicaid, and other federally-funded programs.

291.   As to each of the above factual allegations, Defendants have acted and continue to act with actual knowledge of the truth or falsity of this information, in deliberate ignorance of the truth or falsity of this information and/or in reckless disregard of the truth or falsity of this information.  Defendants knowingly violated the False Claims Act as that term is defined in 31 US.C. § 3729(b)(1)(A)(i-iii).

292.   The United States has been damaged as a result.

I.      **Defendants' Retaliatory Conduct toward Relator**

293.    As alleged above, Mr. Beaujon alerted Defendant Zubkoff and other officers and executives to the illegal practices identified in this complaint.

294.    Defendant Zubkoff and others acknowledged the practices, but refused to stop them.

295.    As a result of his objections to these practices, Mr. Beaujon was demoted and denied appropriate pay raises.

296.    By way of example, shortly after Mr. Beaujon began making objections to Defendant Zubkoff regarding the above practices, including immediately after the meeting with Galbut regarding Medical Directors referenced above.  Defendant Zubkoff told Relator that he "would remember" him and have him fired."This was told Relator on more than one occasion"

297.    In early 2009, following Relator's issuing a report to the Board regarding some of these illegal practices, the Board hired Eyta Brafman to become CFO and Compliance Director and demoted Relator.  After complaining to Mr. Galbut and other members of the Board, Relator was able to keep his title of CFO.  However, his role has been reduced, and he has been excluded from many activities and association with the board.  Many of his duties which were historically CFO responsibilities were given to Ms. Brafman who was less qualified and experienced than Mr. Beaujon.

298.    In September, 2009, Relator received a minimal pay increase in contrast to Defendant Zubkoff.  When he questioned this decision, Board Chairman Russell Galbut informed Relator that he would have to learn to "get along with Zubkoff."

- 68 -

299.   While defendant Zubkoff received a compensation increase of approximately 40% in 2011, and other members of the Senior Management team received over 10% increases, he and Mr. Kalus, who had both complained of the improper practices above, received only 4% increases.

300.   Upon information and belief, Relator was discriminated against in retaliation for his objections to improper conduct in violation of government laws and regulations which resulted in false claims to the United States.

**COUNT I:  FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. §§ 3729 *et seq.***

301.   The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

302.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (B), (C), and (G) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government, or those who knowingly conceal, improperly avoid or decreases an obligation to pay to money to the government, as well as those who conspire to do so.

303.   Compliance with Stark and Anti-Kickback laws is a condition of payment of Medicare, Medicaid and other federally-funded healthcare program.

304.   Pursuant to the Stark laws, 42 U.S.C. § 1395nn, it is unlawful for a physician to make a referral for the provision of medical services, including surgical services, to an entity with which the physician has a financial relationship.  Further, it is

unlawful for an entity to present a claim or cause to be presented a claim for reimbursement to a third party payor, including Medicare, Medicaid, and other federally-funded programs, based upon any service rendered as a result of that referral.

305.   It is a felony, pursuant to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, to knowingly offer and pay any remuneration, in cash or in kind, to any person for the referral of an individual for the provision of medical services which are paid in whole or in part by Medicare, Medicaid, and other federally-funded programs.

306.   Claims for payment to federally-financed healthcare systems, which resulted from unlawful referrals in violation of the Anti-Kickback Statute, are false claims.

307.   By entering into sham agreements with providers, defendants violated the AKS and Stark laws, which in turn resulted in false claims for payment to be submitted to the United States, in violation of 31 U.S.C. §3729(a)(1)(A).

308.   In the furtherance of these schemes, Defendants also caused to be made or used false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B).

309.   Defendants acted knowingly, as that term is used in the False Claims Act.

310.The defendants conspired among and between themselves, and each of them engaged in one or more overt acts in furtherance of the conspiracy.

311.   Because the United States would not have paid for services which it knew to have been the result of kickback schemes, the United States has been harmed in an amount equal to the value paid by the United States.

312.   Defendants deliberately engaged in a vigorous campaign to improperly inflate the reimbursement levels for therapy services to its patients.

313.   The claims for payment to federally-financed healthcare systems which resulted from Defendants' fraudulent practices are false claims and violate the Act.

314.   Defendants' schemes resulted in their knowing submission of false claims, in violation of 31 U.S.C. § 3729(a)(1)(A).

315.   By providing false records to substantiate inflated claims, defendants made and used false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B).

316.   Defendants violated conditions of payment for the claims submitted. Defendants also falsely certified compliance with federal laws and regulations, and such certification is material to the payment of false claims submitted by those providers.

317.   As a result of their violations, defendants received Medicare overpayments and failed to return the money to the government in a timely manner.

318.   Defendants acted knowingly, as that term is used in the False Claims Act. Because the United States would not have paid for services that it knew to have been ineligible for payment in violation of conditions for payment for therapy services, the United States has been harmed in an amount equal to the value paid by the United States.

319.   The United States Government has been damaged as a result of the defendants' conduct in violation of the False Claims Act in an amount to be determined at trial.

## COUNT II:  Retaliation

320.    The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

321.    As alleged in above, Relator engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

322.    Because of Relator's lawful acts, Relator was subjected to discrimination in the terms and conditions of his employment by defendants, including but not limited to his wrongful demotion and denial of appropriate pay raises.

323.    The defendants' retaliatory conduct against Mr. Beaujon violated 31 U.S.C. 3730(h).

324.    As a consequence of Defendants' violation of 31 U.S.C. 3730(h), Mr. Beaujon has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and on his own behalf, demands judgment against Defendants, as follows:

A.      That this Court enter judgment against defendants, jointly and severally, in an amount equal to three times the amount of damages the United States Government has sustained because of each defendants' actions, plus a civil penalty of $11,000 for each claim made in violation of 31 U.S.C. § 3729 *et seq.*, together with the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action.

B.     That in the event the United States Government intervenes in this action, Relator be awarded 25% of any proceeds of the claim, and that in the event the United States Government does not intervene in this action, Relator be awarded 30% of any proceeds.

C.     That relator be awarded all costs and attorneys' fees incurred in the prosecution of this action.

D.     That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

Respectfully submitted,

MORGAN VERKAMP, LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio  45202-2015
Tel. (513) 651-4400
Fax (513) 651-4405
e-mail: Rick.Morgan@morganverkamp.com

By:

Frederick M. Morgan, Jr.
Ohio Bar No. 0027687
Jennifer M. Verkamp
Ohio Bar No. 0067198
Sara Vann
Georgia Bar No. 141787

O'QUINN STUMPHAUZER, P.L.
SunTrust International Center
One SE Third Avenue, Suite 1820
Miami, FL 33131
Tel. (305) 371-9686
Fax (305) 371-9687
E-mail: rks@oquinnstumphauzer.com

By:

Ryan K. Stumphauzer
Florida Bar No. 12176